**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

_____

WHIRLPOOL CORPORATION,

    Plaintiff,

v.

FREIGHT REVENUE RECOVERY SYSTEM, INC.,
registered in Florida as, FREIGHT REVENUE
RECOVERY OF MIAMI, INC., and
RICHARD DAWSON, an individual,

    Defendants.

Case No. _____

**JURY TRIAL DEMANDED**

_____

## COMPLAINT
_____

Plaintiff Whirlpool Corporation ("**Whirlpool**") complains of the Defendants as follows:

1.    This action arises out of a Post Audit Service Agreement ("**Agreement**") between Whirlpool and Freight Revenue Recovery of Miami, Inc. ("**FRRM**"), a copy of which is attached as **Exhibit 1** to this Complaint.

2.    Under the Agreement, FRRM agreed to audit transportation invoices that Whirlpool had previously paid to its motor carriers; to file claims on Whirlpool's behalf for any duplicate or other overcharges; and, within 10 days of any recovery, to remit to Whirlpool the total amount that FRRM was able to recover.

3.    Along with any recovery remitted to Whirlpool, FRRM was obligated to provide Whirlpool with an invoice, setting forth the percentage of that recovery which Whirlpool – under the Agreement – was obligated to pay to FRRM as compensation for such post-audit services. Whirlpool was entitled to keep the remainder of any such recovery.

4. Provided there was no dispute over the invoice, Whirlpool was obligated to pay FRRM the invoiced percentage of such a recovery within 30 days after receipt of such an invoice.

5. Since FRRM had recovered more than $500,000 under the Agreement, Paragraph 5(c)(ii) of the Agreement sets forth the percentage that Whirlpool was obligated to pay to FRRM for the recoveries at issue in this litigation, specifically stating that Whirlpool shall pay "an amount equal to 30% of the total claim recoveries in excess of $500,000 during the term of this Agreement."

6. It has now come to light that the Defendants wrongfully and in breach of the Agreement failed to pay Whirlpool overcharges that they recovered on Whirlpool's behalf and continued to originate new post-audit claims on Whirlpool's behalf *after* Whirlpool had terminated FRRM's authority to do so.

7. This action seeks to recover, in whole or in part, Whirlpool's losses for the more than $280,000 in transportation overcharges that FRRM purportedly secured for Whirlpool but for which FRRM has failed to remit any payment to Whirlpool.

## PARTIES, JURISDICTION, AND VENUE

8. Whirlpool is a Delaware corporation with its principal place of business located in Berrien County, Michigan.

9. FRRM is a Delaware corporation, registered in Florida as Freight Revenue Recovery of Miami, Inc., with its principal place of business located at 13977 S.W. 140th Street, Miami, Florida 33186.

10. At all relevant times, Defendant Richard Dawson ("**Dawson**") has been the owner of FRRM; and he resides at 13269 S.W. 146th Street, Miami, Florida 33186.

11. This Court has subject matter jurisdiction over Whirlpool's claim against the Defendants pursuant to 18 USC § 1964(c) of the Racketeer Influenced and Corrupt Organizations Act ("**RICO**"), because Whirlpool – as explained more fully below – has been injured due to a violation of the RICO statute.

12. Because the remainder of Whirlpool's claims alleged below arise out of the same case or controversy as Whirlpool's RICO claims, this Court has supplemental jurisdiction under 28 USC § 1367 to hear the non-RICO claims.

13. This Court also has personal jurisdiction over Defendants pursuant to 18 USC §§ 1965(b) and (d) because Whirlpool – as explained more fully below – has been injured in this Court's judicial district as a result of Defendants' violation of the RICO statute.

14. An additional or alternative basis for this Court's personal jurisdiction over the Defendants is set forth in MCL § 600.705(2), because – as explained more fully below – Defendants' tortious conduct has caused injury to Whirlpool in this Court's judicial district.

15. Venue is proper in this Court under both 28 U.S.C. § 1391(b) and 18 USC § 1965(a), because a substantial number of the events and omissions giving rise to Whirlpool's claims in this litigation occurred in this Court's judicial district and the Defendants transacted affairs within this district.

## GENERAL ALLEGATIONS

16. The Agreement was entered into in Michigan and it has an effective date of September 15, 2009.

17. Pursuant to Paragraph 2(b) of the Agreement, Whirlpool agreed to the appointment of FRRM as Whirlpool's agent for the sole purpose of FRRM carrying out and pursuing its post-audit claims directly with Whirlpool's motor carriers.

3

18. For the duration of the Agreement, FRRM, via Dawson and other employees of FRRM, conducted such post-audit services on Whirlpool's behalf, including, but not limited to:

- Accessing transportation invoices located on CassPort, Cass Information System's internet reporting service, available at: https://my.cassport.com/. Cass is a third party that Whirlpool uses to process its freight invoices.

- Making or wiring payments for any post-audit recoveries to Whirlpool representatives or Whirlpool financial accounts located in Michigan.

- Directing emails or other communications (verbal and in writing) to Whirlpool representatives in Michigan related to such post-audit services, any overcharge motor carrier recoveries, or other issues under the Agreement.

- Corresponding, in writing and otherwise, with Whirlpool's motor carriers, including some carriers located in Michigan, regarding potential overcharges to Whirlpool.

**DISCOVERY OF UNAUTHORIZED RECOVERIES**

19. On March 11, 2013, Whirlpool notified FRRM that Whirlpool was exercising its right under Paragraph 10 of the Agreement to terminate the Agreement by giving 30 days' prior notice.

20. A copy of Whirlpool's 30-day notice to FRRM is attached as **Exhibit 2.**

21. Around the same time as this March 11, 2013 notification to FRRM, Whirlpool and FRRM verbally agreed – via a conference call, including Dawson – that FRRM would be

allowed to finish pursuing any overcharge freight claims that it had pending for Whirlpool as of that notification date (collectively referred to here as the **"pre-notification claims"**), but no other claims.

22.     As such, this notice by Whirlpool effectively terminated the Agreement as of April 11, 2013, and therefore revoked any authority FRRM had to act on Whirlpool's behalf, except with regard to finishing up the pre-notification claims.

23.     Whirlpool's termination of the Agreement and revocation of FRMM's authority included termination of FRRM's right under Paragraph 6 of the Agreement to access Whirlpool confidential and proprietary information and documents for providing, originating, and pursuing any new post-audits of Whirlpool motor carriers after March 11, 2013.

24.     It is now known that, since as early as December of 2012, FRRM has recovered at least $280,186 in overcharges paid by Whirlpool to its motor carriers that the Defendants kept for themselves, failing to pay anything to Whirlpool for such recoveries.

25.     Recoveries by FRRM included overcharge claims that the Defendants originated after March 11, 2013, despite neither FRRM nor Dawson having any authority to pursue such new post-audits on Whirlpool's behalf, or to otherwise access Whirlpool's invoices, databases, or other confidential information, or hold FRRM out to Whirlpool's motor carriers as having the authority to seek such collections for Whirlpool.

26.     Recoveries by FRRM may also include recoveries on pre-notification claims, which the Defendants deposited into their own bank accounts and for which Defendants never paid Whirlpool its agreed-to percentage for those recoveries (as explained below).

27.     Whirlpool has determined that the 78 checks attached as **Exhibit 3** to this Complaint represent $280,186 in overcharges recovered by the Defendants but not paid to

5

Whirlpool, which were deposited into the Defendants' accounts – despite each check being made payable to Whirlpool, Whirlpool c/o FRRM, or Whirlpool and FRRM.

28. For any of the recoveries made by FRRM under the Agreement and under the parties' agreement regarding the pre-notification claims, FRRM was obligated to pay the total amount of these checks to Whirlpool, following which, if nothing was disputed regarding such recoveries, Whirlpool would keep 70% and pay 30% back to FRRM for securing each such recovery.

29. Despite several demands by Whirlpool requesting that FRRM remit payment to Whirlpool for these wrongfully and fraudulently obtained overcharges, and Whirlpool's demand for an accounting to determine the pre-notification claims pursued by FRRM and FRRM's recoveries of all Whirlpool post-audit claims since December 2012, FRRM has, to date, refused to pay any monies or provide such an accounting.

## COUNT I – RICO
### (Both Defendants)

30. Whirlpool incorporates by reference the allegations in all previous paragraphs.

31. Whirlpool has a right to bring a civil action under RICO pursuant to 18 U.S.C. §§ 1962(c) and 1964.

32. Dawson is the owner of FRRM, which offers national, post-audit services to recover duplicate or other forms of overpayments by companies, like Whirlpool, to their motor carrier vendors.

33. Dawson associated with FRRM to form the enterprise which was responsible for committing acts intended to and that did defraud Whirlpool of such overpayments made to motor carriers of Whirlpool.

6

34. Dawson's fraudulent acts include knowingly using interstate mail and wire communications to fraudulently obtain recoveries from Whirlpool motor carriers, by misrepresenting to Whirlpool's motor carriers that they were acting to collect on Whirlpool's behalf, when the Defendants clearly had no intention of remitting any payment to Whirlpool.

35. Defendants, by and through their association, also knowingly used interstate mail and wire communication to deposit at least 78 ill-gotten checks from Whirlpool motor carriers into FRRM accounts, despite each check being made payable, at least in part, to Whirlpool. Copies of these checks are attached as **Exhibit 3.**

36. Further, Defendants defrauded Whirlpool by using interstate mail and wire communications to originate new post-audits after being notified that they no longer had the authority to do so, including using interstate mail and wire communications to access Whirlpool's confidential and proprietary information – downloaded from https://my.cassport.com prior to April 11, 2013 – for this fraudulent purpose.

37. Defendants knew, or had reason to know, that they would need to use interstate mail and wire communications, including in the manner explained above, to defraud Whirlpool of its right to any such recovered freight overpayments.

38. Dawson directed FRRM and its employees to commit such acts to defraud Whirlpool, by directing FRRM employees to keep recoveries purportedly collected for Whirlpool, to pursue Whirlpool recoveries which FRRM had no authority to pursue, and to cover up such activities by not providing Whirlpool with its requested accounting of the pre-notification claims being pursued by FRRM and FRRM's recoveries of post-audit claims since December 2012

39.     The racketeering acts constitute a pattern of racketeering, because the acts are related in that they had the same method, purpose, participants, and victim, and these acts all occurred over more than a one-year period, starting as early as December of 2012.

40.     As a direct result of the Defendants' racketeering acts, Whirlpool has suffered damages, which may include, but may not be limited to, $259,886, which represents the $280,186 of freight overcharges that Whirlpool now knows that the Defendants fraudulently kept for themselves less a setoff for the $20,300 in overcharges that Whirlpool recognizes as being payable recoveries by FRRM under the Agreement.

41.     Pursuant to 18 U.S.C. § 1964(c), any recovery under Whirlpool's RICO claim here will include treble damages and Whirlpool's costs and attorney fees for Whirlpool's pursuit of this claim.

WHEREFORE, Whirlpool requests that this Court enter a judgment in favor of Whirlpool and against Defendants FRRM and Dawson that orders Defendants to provide Whirlpool with a complete accounting of their post-audit activities and recoveries for Whirlpool dating back to September 15, 2009; and to pay Whirlpool for its damages, which may include, but may not be limited to, the $259,886 in freight overcharges described above, plus treble damages, as well as its costs and attorneys' fees in pursuit of this case.  Whirlpool further requests that this Court grant Whirlpool such other and further relief, including all applicable interest, as may be just and proper.

### COUNT II – BREACH OF CONTRACT
### (FRRM only)

42.     Whirlpool incorporates by reference the allegations in all previous paragraphs.

43.     Whirlpool has complied with all of its obligations under the Agreement and the parties' verbal agreement regarding pre-notification claims.

8

44. FRRM has failed to comply with its obligations under the Agreement and the parties' verbal agreement regarding pre-notification claims to remit payments to Whirlpool of any overcharges recovered but not paid to Whirlpool (despite purportedly being recovered on behalf of Whirlpool).

45. FRRM has also failed to comply with its obligation under the Agreement and the parties' verbal agreement regarding pre-notification claims to stop holding itself out as Whirlpool's authorized agent and accessing Whirlpool's confidential and proprietary information in order to carry out any new post-audits on Whirlpool motor carriers <u>after</u> being notified by Whirlpool that this authority was terminated.

46. Whirlpool currently knows that FRRM has refused to remit any part of the 78 checks attached here as **Exhibit 3** that FRRM was able to recover from motor carriers for Whirlpool overpayments.

47. As a direct result of FRRM's breach and refusal to comply with its contractual obligations to Whirlpool, Whirlpool has incurred damages of at least $175,830 for such recoveries, which represents Whirlpool's 70% share of the $280,186 kept by FRRM, or $196,130, less a setoff for the $20,300 in overcharges that Whirlpool recognizes as being payable recoveries by FRRM under the Agreement.

WHEREFORE, Whirlpool requests that this Court enter a judgment in favor of Whirlpool and against FRRM that orders FRRM to provide Whirlpool with a complete accounting of its post-audit activities and recoveries for Whirlpool dating back to September 15, 2009; and to pay Whirlpool for its damages, which may include, but may not be limited to, the $175,830 portion of the freight overcharges described above. Whirlpool further requests that this

Court grant Whirlpool such other and further relief, including all its costs to pursue this collection, reasonable attorneys' fees, and applicable interest, as may be just and proper.

### COUNT III – UNJUST ENRICHMENT OR QUASI-CONTRACT
### (Both Defendants)

48. Whirlpool incorporates by reference the allegations in all previous paragraphs.

49. Since December of 2012, FRRM, at Dawson's direction, has collected overcharges Whirlpool made to its motor carriers even though neither FRRM nor Dawson had any legal or contractual right to keep those overcharges or, in some instances, to originate such post-audits on Whirlpool's behalf.

50. Despite having no right to such overcharges and, in some instances, lacking any authority to originate or otherwise pursue such overcharges on Whirlpool's behalf, Whirlpool currently knows that FRRM has wrongfully kept the recoveries represented by the 78 checks attached here as **Exhibit 3**.

51. Defendants have been unjustly enriched at Whirlpool's expense by keeping the full amount of any freight overpayment by Whirlpool that FRRM had no authority to pursue or, in the alternative, by not remitting 70% of any recovery that Defendants were authorized – in writing, verbally, or otherwise – to pursue on Whirlpool's behalf.

52. The amount by which Defendants have been unjustly enriched is equal to the amount by which the overcharges wrongfully kept by Defendants exceed any setoff from Whirlpool to FRRM.

53. Based on the total amount of the wrongfully kept overcharges kept by FRRM (which Whirlpool knows about to date), Defendants have been unjustly enriched in an amount up to $259,886.

10

WHEREFORE, Whirlpool requests that this Court enter a judgment in favor of Whirlpool and against Defendants FRRM and Dawson that orders Defendants to provide Whirlpool with a complete accounting of their post-audit activities and recoveries for Whirlpool dating back to September 15, 2009; and to pay Whirlpool for its damages, which may include, but may not be limited to, $259,886 described above, Whirlpool further requests that this Court grant Whirlpool such other and further relief, including all its costs to pursue this collection, reasonable attorneys' fees, and applicable interest, as may be just and proper.

WARNER NORCROSS & JUDD LLP

Dated: October 14, 2014

By: /s/Lance R. Zoerhof
Lance R. Zoerhof (P63980)
Jeff Dornbos (P74514)
900 Fifth Third Center
111 Lyon Street NW
Grand Rapids, MI 49503-2487
lzoerhof@wnj.com
jdornbos@wnj.com
616.752.2000
Attorneys for Plaintiff

## JURY DEMAND

Whirlpool hereby requests a jury for this matter.

WARNER NORCROSS & JUDD LLP

Dated: October 14, 2014

By: /s/Lance R. Zoerhof
Lance R. Zoerhof (P63980)
Jeff Dornbos (P74514)
900 Fifth Third Center
111 Lyon Street NW
Grand Rapids, MI 49503-2487
lzoerhof@wnj.com
jdornbos@wnj.com
616.752.2000
Attorneys for Plaintiff

11278429-13